1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SUMMER SANCHEZ, an individual,** ) | **CV F 06-0152 AWI DLB** |
| ) | |
| **Plaintiff,** ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER DENYING** |
| **v.** ) | **DEFENDANT'S MOTION FOR** |
| ) | **SUMMARY JUDGMENT** |
| **CORRECTIONS CORPORATION OF** ) | |
| **AMERICA, a Maryland Corporation;** ) | (Document #16) |
| **and DOES 1 through 100, inclusive,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**BACKGROUND**

On December 22, 2005, Plaintiff filed her complaint in the Kern County Superior Court. The complaint alleges that Defendant Corrections Corporation of America discriminated against Plaintiff based on her national origin, race, and/or ancestory in violation of FEHA, wrongfully terminated Plaintiff because of her national origin, race, and/or ancestory in violation of FEHA, and terminated Plaintiff in violation of California's public policy.

On February 10, 2006, Defendant removed this action to this court because the parties are citizens of different states and over $75,000.00 is in controversy.

On September 8, 2006, Defendant filed a motion for summary judgment.   On September 28, 2006, Plaintiff filed an opposition.  On October 2, 2006, Defendant filed a reply.

**LEGAL STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

> Under summary judgment practice, the moving party [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280

1   (9th Cir. 1979).

2       In attempting to establish the existence of this factual dispute, the opposing party may not

3   rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of

4   specific facts in the form of affidavits, and/or admissible discovery material, in support of its

5   contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank,

6   391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973). The opposing party must

7   demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the

8   suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W.

9   Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that

10  the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for

11  the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d

12  1433, 1436 (9th Cir. 1987).

13      In the endeavor to establish the existence of a factual dispute, the opposing party need not

14  establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

15  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

16  trial." First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose

17  of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether

18  there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)

19  advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin

20  Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

21      In resolving the summary judgment motion, the court examines the pleadings,

22  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

23  any. Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th

24  Cir. 1982). The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and

25  all reasonable inferences that may be drawn from the facts placed before the court must be drawn

26  in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc.,

27

28                                          3

369 U.S. 654, 655 (1962)(per curiam); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## FACTS

**A.  Undisputed Facts[1]**

Plaintiff was hired by Defendant Corrections Corporation of America ("CCA") as a Corrections Officer at its detention facility in California City, California (the "California City facility") on or about July 12, 2002.

At all times during her employment at CCA, Plaintiff was an at-will employee pursuant to a written at-will agreement.

Plaintiff was terminated from her employment at CCA on October 22, 2004.

At all times during her employment at CCA, Plaintiff was aware of CCA's "Code of Ethics and Business Conduct" and CCA's "Harassment Policy" and she understood that according to these polices harassment was prohibited.   Plaintiff understood it was her responsibility to report harassment or any unlawful conduct to her supervisor, human resources, or the Warden.

At her deposition, Plaintiff testified that she had no reason to believe that John Fergoson, the president and chief executive officer of CCA, did not consider CCA's harassment policies

---

[1]  These facts are taken from Defendant's proposed undisputed facts, Plaintiff's responses, and Defendant's reply.

important.   Plaintiff testified that she had no reason to believe that Mr. Fergoson or anyone who is an officer in CCA would condone racial discrimination.   In response to Plaintiff's testimony about Mr. Fergoson and other officers of CCA, Plaintiff cites to others who made racist and sexist comments.   Given the level of harassment by all employees, Plaintiff contends an inference can be made that CCA's polices were superficial and Plaintiff could reasonably believe they would not be enforced.[2]

During the time she worked a CCA, Sanchez never reported any racial comments made by any other CCA employee that she believed were in violation of CCA policy.

The parties agree that after becoming warden of CAA's facility in California City in January 2003, Gilkey adopted a zero-tolerance policy with respect to racial comments in the workplace.   Under the zero-tolerance policy, employees were informed that they would be terminated if they made racial comments in the workplace.   Plaintiff provides additional evidence that Gilkey's zero-tolerance policy was with respect to all harassing and offensive comments in the workplace, including sexual comments.   See Sanchez Dec. ¶ 3.[3]

Sanchez was aware that Warden Gilkey had adopted a zero tolerance policy with respect to racial comments and that she could be terminated if she violated the policy.[4]

---

[2] Defendants object as hearsay to Plaintiff's testimony about what others said.   While Defendants' objection is sustained, not considering these other comments does not change the outcome of this motion.   Defendant did not contend in this motion that Gilkey's and/or other supervisors' actions cannot be attributed to Defendant.   In addition, the use of other employee's statements to impute a racial motive on Defendant has not been sufficiently briefed or argued by the parties.   Only comments Gilkey and CCA were aware of could be grounds for imputing a motive on Gilkey and CCA.   Regardless, whether Plaintiff believed the zero-tolerance policy would be enforced is not relevant.   There is no evidence Plaintiff's belief regarding whether the policy would be enforced is an exception to the zero-tolerance policy.

[3] The court sustains Defendants' objections to the rest of Paragraph 3 in Sanchez's Declaration.   Which comments Gilkey was primarily concerned about and whether Gilkey was aware that harassing and offensive comments continued after he announced the policy calls for speculation on the part of Plaintiff.   Plaintiff lacks personal knowledge as to Gilkey's thought process and what incidents he was aware of.

[4] The parties dispute whether Plaintiff believed the policy would actually be enforced.   It is not necessary to resolve this dispute because there is no evidence that Plaintiff's belief regarding the policy's enforcement would be an exception to the zero-tolerance policy.

On September 1, 2004, Plaintiff was accessing certain chemicals when Sergeant Yvette Garcia approached her and asked her to escort a prisoner.   Plaintiff told Garcia that she had been ordered by her superior to attend to the chemicals before engaging in other duties.   Plaintiff admits that after Garcia persisted, Plaintiff responded: "I wish you would get off my ass, you're on me like a black on watermelon."   Plaintiff was upset with Garcia and was not joking when she made the comment.

At some time Plaintiff became aware that her comment would be offensive, in particular to African-Americans, because she had used the word "black."[5]

Correctional Officer Kathy Heariold, an African-American, heard Sanchez's comment.

On or about September 4, 2006, Heariold made a statement to Captain Yvette Garcia, stating she was African-American and was very offended by Plaintiff's comment.[6]

On September 29, 2004, Plaintiff signed CCA's problem solving notice, which recommended termination for the comment Plaintiff had made.

Plaintiff admits that a comment about someone's race was a violation of CCA policy.   At the time Plaintiff made her comment, she was aware that Warden Gilkey had stated there was a zero-tolerance policy against racial comments.[7]

On October 22, 2004, Plaintiff was terminated.   CCA stated the reason for the termination from CCA was because Plaintiff violated CCA's zero tolerance policy.   The parties

---

[5]   The parties dispute whether Plaintiff was aware the comment was offensive at the time she made the comment.   The parties' dispute is based on an their differing interpretations of Plaintiff's answers to questions during her deposition.   Because there is no evidence Plaintiff's lack of knowledge would be a defense to the zero-tolerance policy, it is not relevant if Plaintiff knew the comment was offensive when she made it.

[6]   The parties dispute whether Heariold was offended by the comment.   Because there is no evidence the absence of anyone being offended by a comment is a defense to the zero-tolerance policy, it is not necessary for the court to resolve whether Heariold reported Plaintiff because she was offended or because she wanted to "teach Plaintiff a lesson."

[7]   The parties dispute whether Plaintiff really believed she would be terminated for making this comment under the zero-tolerance policy.   It is unnecessary to resolve this dispute because Plaintiff's *belief* as to whether the zero-tolerance policy was actually enforced, as opposed to whether the policy was *in fact* enforced, is not relevant.

dispute the real reason Plaintiff was terminated.

Only two racial comments have been reported to CCA that were made after Gilkey issued his zero-tolerance policy – Comments by Reeve and Sanchez.   In both cases, Gilkey states in his declaration that he terminated the employees for violation of the zero-tolerance policy and he is solely responsible for making that decision.   The parties dispute what the zero-tolerance policy was and if a violation of the zero-tolerance policy was the real reason for Gilkey's actions.

Officer Reeve is White.   At some time prior to Plaintiff's statement, Reeve said to Officer Spencer, an African-American employee, that Spencer "was being treated like a nigger child."[8]   Reeve was terminated for violating the zero-tolerance of any racial comments policy sometime within a month to four months after she made the "nigger child" comment.   Plaintiff claims that prior to her termination, Reeve was reprimanded on four separate occasions for making racial comments.   Other than Reeve's hearsay statements to Plaintiff, there is no evidence regarding what the prior reprimands were for.   Regardless, Plaintiff admits all of the prior incidents involving Reeve occurred before the adoption of the zero-tolerance policy.

Spencer is an African-American employee.   According to Plaintiff, Spencer once referred to Officer Jackson, also an African-American employee, as a "fucking nigger."   Spencer was not terminated for this action.   Plaintiff does not know when the comment was made or if it was ever reported to CCA.   CCA became aware that Spencer made a racial comment for the first time during the termination proceedings for Reeve discussed above.[9]

---

[8]  The parties dispute whether this statement was made on August 29, 2004 or a month before Plaintiff's September 2, 2004 comment.   It is unnecessary to resolve this dispute because the parties agree Reeve's statement was made after Gilkey announced the zero-tolerance policy and before Plaintiff made her statement.

[9]  While Plaintiff disputes when CCA became aware of Spencer's statement, Defendants' proposed fact is still undisputed.   Plaintiff offers no evidence to refute Defendants' evidence on when CCA became aware of the statement.   The fact that other correctional officers were aware of the statement earlier does not show that Gilkey and Defendant were aware of the statement.
Plaintiff also disputes whether the statement was "fucking nigger" or "Nigga, if you want to, get it yourself."   It is irrelevant what Spencer's exact statement was as both are racially insensitive.   The issue of whether Spencer made two racial statements and whether Gilkey and Defendant knew about both statements is discussed below.

1    At the time of her termination, Reeve told CCA that Spencer had stated to Officer

2 Jackson, "Nigga, if you want it, get it yourself."    Defendants' offer Gilkey's declaration in

3 which he states that Reeve told him this comment was made in 2002.   While Plaintiff disputes

4 when this statement was made and contends there were two comments, Plaintiff offers no

5 evidence that the comment reported by Reeve to Gilkey was not the "Nigga, if you want it, get it

6 yourself" comment.  Plaintiff also offers no evidence that the reported comment was made more

7 recently than 2002.   In her deposition, Plaintiff testified about a "fucking nigger" comment

8 Spencer had made.  In her deposition, Plaintiff testified this comment was made after Gilkey was

9 warden and made in front of both Reeve and Plaintiff.   However, Plaintiff offers no evidence

10 that Gilkey, or anyone at CCA, was ever made aware that there were two comments and one of

11 them happened when Gilkey was warden and/or after the zero-tolerance policy was inacted.

12 Without evidence from Reeve, Gilkey, or some other source, the court must find the undisputed

13 facts show Gilkey was only aware of Spencer's 2002 comment.

14    Spencer was only suspended because the comment he made was made in 2002, before

15 Gilkey instituted the zero-tolerance policy.

16    In her complaint, Sanchez contends that Burgess used a racial slur towards an African-

17 American and was not terminated.   At her deposition, Plaintiff testified that Burgess made a

18 racial comment about Mexicans.   Sanchez does not know who heard Burgess's comments or

19 whether they were made before or after Gilkey issued the zero-tolerance policy.   In addition,

20 Plaintiff has no knowledge of whether any racial comments by Burgess were reported to Gilkey

21 and Defendant.   Defendant is unaware of any racial comments made by Burgess.  It has never

22 been reported to Defendant that Burgess made a racial comment of any kind.

23    Defendant suspended Burgess for making a sexual comment to another female

24 correctional officer that she had "DSL."  When the female correctional officer asked what DSL

25 stood for, Burgess replied "Dick Sucking Lips."   Burgess was subsequently given a forty hour

26 suspension. This incident occurred on July 12, 2004. See Gilkey Dec. at ¶ 7.  Gilkey states that

27

28                                          8

1  he made the decision to suspend Burgess for forty hours because "I did not consider the comment

2  she made to be a racial comment.  I was solely responsible for that decision."   Id.

3      Plaintiff testified that an employee named "Brian," who was a correctional officer, made

4  a comment about black people.  Brian is not a Mexican.  Plaintiff testified Brian was treated

5  differently.   Plaintiff testified that she did not hear Brian's comment directly and only overheard

6  a conversation about the comment.  Plaintiff testified a white CCA employee named Gillespie

7  was offended by Brian's comment.   Plaintiff does not know why the comment would be

8  offensive.   Plaintiff does not remember any of the employees' names that were allegedly

9  involved in or witnessed this incident.   Plaintiff has no knowledge that any racial comment by

10 Brian was reported to CCA.   Plaintiff admitted that the comment would have been made before

11 Gilkey issued the zero tolerance policy.

12     Plaintiff testified that Lieutenant Sorensen stated that "all Mexicans were a bunch of

13 beaners."   Although Plaintiff believed this comment was a violation of CCA policy, she never

14 followed CCA's guidelines for reporting harassment or discrimination by reporting Sorensen's

15 conduct to a supervisor, human resources, or the Warden.

16     Plaintiff also testified that either a lieutenant or captain allegedly made the comment that

17 "beaners only eat rice and beans and menudo" to other officers.  Plaintiff believed this comment

18 was in violation of CCA policy.   This captain or lieutenant was white.   Plaintiff does not recall

19 the name of the individual who made the comment and she never reported the incident.

20 **B. Plaintiff's Additional Facts**

21     Plaintiff offers additional facts.   Defendant objects to these facts because they are not

22 relevant to whether Plaintiff violated the zero-tolerance policy.    While there are relevancy

23 concerns regarding these facts, they have been included here for completeness and because they

24 do not change the motion's outcome.   These facts are as follows:

25     - During her employment, Plaintiff received numerous accolades, including two

26 certificates for perfect attendance for the years 2003 and 2004 and Workwise Employee of the

27

28                          9

Month for July 2004.

- Plaintiff was subjected to sexually harassing comments and touching by co-workers at CCA.

- Sorensen was Plaintiff's supervisor at CCA.   Sorensen made sexually harassing comments twice a week beginning at the end of 2003 and continuing until the end of Plaintiff's employment.   Sorensen asked Plaintiff about sexual positions, asked her about the color of her underwear, said she looked good in her pants, and asked which way she could bend.   Sorensen also tried to give Plaintiff a massage.   Sorensen came up from behind Plaintiff and started to rub her shoulders.   Plaintiff immediately pushed him away.   In response Sorensen told her to "stop being a prude."   Plaintiff believed that Sorensen's comments were in violation of CCA's policy against harassing and offensive comments.

- During her employment, Officer Berham made at least five sexual comments to Plaintiff that Plaintiff believed were in violation of CCA policy.   Berham made comments about Plaintiff's body and told her to take a picture with her "ass in the air naked."   Berham made these comments in front of Officer Gillespie.

- Plaintiff's alleged racial comment was her only offense at CCA.

- Reeves told Plaintiff that her termination was unfair because Reeves got numerous warnings before she was fired, but Plaintiff was terminated on the first occasion.

- The CCA written policy and the policy Plaintiff was terminated for defines harassment as including verbal harassment based on race, sex, national origin, age, religion, or handicap.

**DISCUSSION**

**A. Discrimination Claims Under FEHA**

The legal standards for FEHA claims on a motion for summary judgment are not in dispute and are agreed on by the parties.   In general, courts have used the standards provided in Title VII cases when analyzing claims under FEHA.   See Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1219 (9th Cir.1998); Linsley v. Twentieth Century Fox FilmsCorp., 89 Cal.Rptr.2d 429,

431 (1999).

In dealing with motions for summary judgment concerning discrimination claims, the Supreme Court has set forth an indirect method of proof that relies on presumptions and shifting burdens of production. See  McDonnell Douglas Corp, 411 U.S. 792 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981). Under this framework, a plaintiff opposing summary judgment carries the initial burden of establishing a prima facie case of employment discrimination.  McDonnell Douglas Corp, 411 U.S. at 802; Washington v. Garrett, 10 F.3d 1421, 1432-33 (9th Cir. 1993).   While the specific elements of a prima facie case vary depending on the particular facts, the parties agree that a plaintiff must provide evidence that (1) she was a member of a protected class, (2) she was qualified for the position she sought or was performing competently in the position she held, (3) she suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive.  Guz v. Bechtel Nat. Inc., 24 Cal.4th 317, 355 (2000).

By establishing a prima facie case, the plaintiff raises a presumption that the employer engaged in intentional discrimination. Burdine, 450 U.S. at 254.  The burden of production then shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to raise a genuine issue of fact and to justify a judgment for the employer, that the employer's actions were taken for a legitimate, nondiscriminatory reason.   Burdine, 450 U.S. at 253; McDonnell Douglas Corp., 411 U.S. at 802; Guz, 24 Cal.4th at 355-56.  If the employer can do so, the plaintiff must then raise a genuine factual issue as to whether the employer's articulated reasons were pretexts for discrimination or offer any other evidence of discriminatory motive. Garrett, 10 F.3d at 1432-33; Guz,  24 Cal.4th at 356.  If the plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate because it is for the trier of fact to decide which story is to be believed.  Garrett, 10 F.3d at 1433.

Plaintiff's first six claims or causes of action allege discrimination and wrongful

termination based on discrimination.    The parties agree that the issue on Defendant's motion for summary judgment as to these claims is whether Defendant had a legitimate, nondiscriminatory reason to terminate Plaintiff and whether Plaintiff has provided evidence to rebut Defendant's nondiscriminatory reason for Plaintiff's termination.

Defendant offers evidence that it fired Plaintiff for violating Gilkey's zero-tolerance policy toward racial comments.    Defendant argues that Plaintiff has no evidence that anyone else who made a racial comment after the zero-tolerance policy was in place and had their comment reported to CCA and/or Gilkey was not terminated.    In fact, all evidence indicates that the only other person who made a racial comment after the zero-tolerance policy was in effect – Reeve – was also terminated.  Based on this evidence, Defendant has come forward with a legitimate non-discriminatory reason for Plaintiff's termination.

In her opposition, Plaintiff comes forward with several disputed issues of fact to show pretext.    Plaintiff provides evidence that she did not realize her statement was a racial insult when she made the comment.    Plaintiff also argues that there is a disputed issue of fact on whether anyone was offended by her comment.  Plaintiff states that Heariold reported Plaintiff to supervisors, and ultimately Gilkey, out of revenge and not because Heariold, as an African-American co-worker, heard the comment and was offended.    Neither of these potential disputed issues of fact are relevant on the issue of pretext.    There is no evidence that Gilkey's zero-tolerance policy had an exception if the employee did not realize her comment was offensive. There is also no evidence that Gilkey's zero-tolerance policy had an exception if no employee was offended by the comment.    Thus, even assuming Plaintiff did not know her comment was offensive when she made it and Heariold's motive in reporting Plaintiff had nothing to do with Heariold being offended, Plaintiff has not shown pretext.    Based on all evidence regarding Gilkey's zero-tolerance policy that is before the court, these facts simply do not show pretext.

The parties spend considerable time in their briefs addressing other individuals and their comments.    However, simply because other employees made racial comments and were not fired

12

is not sufficient to show pretext.   Defendant's proffered reason for Plaintiff's termination is

Gilkey's zero-tolerance policy.  As such, to show Plaintiff was treated differently than other

employees, Plaintiff would have to show that CCA and Gilkey were aware of these other

improper comments after Gilkey's zero-tolerance policy was put into effect and still did nothing.

Improper comments made prior to the zero-tolerance policy simply do not show pretext because

Defendant's proffered reason for Plaintiff's termination did not exist during this time.  Thus, the

evidence of Spencer's comments and Reeve's earlier statements do not show pretext.   In

addition, improper comments for which there is no evidence CCA and Gilkey knew about do not

show pretext because Defendant's proffered reason for Plaintiff's termination could not apply to

comments Defendant did not know about.   Thus, the evidence of comments made by Sorensen,

Berham, "Brian," and the unknown captain or lieutenant do not show pretext.

While these disputed issues of fact are not material and do not show pretext, in her

opposition, Plaintiff has come forward with two pieces of evidence that, if true, could show

pretext.   First, the court finds that Plaintiff has created a disputed issue of material fact on what

Gilkey's zero-tolerance policy was.  In his declaration, Gilkey states that after he began his tenure

as Warden, he issued a zero-tolerance policy regarding any racial comment by a CCA employee.

See Gilkey Dec. ¶ 3.    In Paragraph 3 of Plaintiff's declaration, Plaintiff states that in a recall

meeting, in front of a limited number of CCA employees, Gilkey stated that there would be a

zero-tolerance policy with respect to all harassing and offensive comments in the workplace,

including sexual comments.   See Sanchez Dec. ¶ 3.   While Defendant objects to the rest of

Paragraph 3 and much of the rest of Plaintiff's declaration, Defendant does not object to this

sentence.   Because this sentence appears to be based on Plaintiff's personal knowledge of what

Gilkey announced his policy would be, the court finds it admissible for the purposes of this

motion.   The court also does not find this statement directly conflicts with Plaintiff's deposition

testimony.   In the portions of Plaintiff's deposition cited by the parties, Plaintiff was asked if she

was aware that there was a zero-tolerance policy on racial comments in the workplace.  See

13

Sanchez Depo. at 139 & 141.   The parties have not cited the court to portions of Plaintiff's deposition in which she was asked what Gilkey's policy was and/or asked if it included sexually offensive comments.   Because Plaintiff did not testify at her deposition Gilkey's zero-tolerance policy only included racial comments and never stated it did not include sexual comments, the court does not find Plaintiff's declaration inconsistent with her deposition testimony.   See Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266-67 (9th Cir.1991) (while a party cannot create an issue of fact by filing a declaration that contradicts prior deposition testimony, a declaration is only a sham if it flatly contradicts earlier testimony).   Thus, Plaintiff has created a disputed issue of fact on whether Gilkey's zero-tolerance policy only applied to harassing racial comments or applied to both harassing racial and harassing sexual comments.

Taking Plaintiff's evidence as true, the inclusion of sexually offensive comments as part of Gilkey's zero-tolerance policy provides Plaintiff with possible evidence of pretext.   The evidence before the court reveals that Burgess told another female correctional officer that she had "DSL", a sexually offensive comment.   The evidence reveals that this comment was made after Gilkey issued the zero-tolerance policy.   The evidence also reveals that Burgess was suspended and not terminated for this comment.   If Burgess is included in the group of people who violated Gilkey's zero-tolerance policy, Plaintiff has provided evidence that a white officer was treated differently than she was.

The issue thus becomes whether evidence that one white officer was treated differently than Plaintiff for violating Gilkey's zero-tolerance policy is sufficient evidence to show a disputed issue of fact on pretext.  Given the size of the group of people who violated the zero-tolerance policy, the court finds Gilkey's different treatment of Burgess is sufficient to show a disputed issue of fact on whether Defendant's stated reasons for terminating Plaintiff were pretext for a racial motive.   There is evidence that Defendant knew of only three people who violated the zero-tolerance policy.   The evidence before the court shows that Plaintiff, Reeve, and Burgess were the only ones who made harassing statements after Gilkey announced the zero-

14

tolerance policy and whose harassing statements reported to CCA and Gilkey.   As such, only three people are in the relevant class.   Plaintiff was treated differently than 33.3% of the other officers who violated the zero-tolerance policy.   The officer who was treated differently was not Mexican, but White.   On this motion for summary judgment, the court finds Plaintiff has created a genuine factual issue of material fact as to whether Defendant's articulated reasons were pretext for discrimination.

In making this finding, the court does not find that Plaintiff has in fact shown Defendant's actions were discriminatory.   A trier of fact may well find that Gilkey's zero-tolerance policy only included racially offensive statements, and was thus was applied consistently.   In addition, even if a trier of fact finds Gilkey's zero-tolerance policy included sexually offensive statements, a trier of fact may find another explanation for the difference in treatment between Plaintiff and Burgess other than illegal discrimination.   However, at this time, the court finds that given the evidence of a disputed issue of fact over Gilkey's exact policy and the fact there is evidence Burgess, a white employee, may have violated Gilkey's policy and not been fired, the court cannot grant summary judgment for Defendant on Plaintiff's first six claims.

**B.   Termination in Violation of Public Policy Claim**

In its motion for summary judgment, Defendant also asks for summary judgment on Plaintiff's seventh claim.   The seventh claim alleges termination in violation of public policy. The parties agree that in a termination in violation of public policy claim, the plaintiff must prove: (1) An employer-employee relationship;  (2) The termination of the plaintiff violated public policy; (3) The termination of employment was a legal cause of the plaintiff's damage; and (4) The nature and the extent of the plaintiff's damages.   Holmes v. General Dynamics Corp., 17 Cal.App.4th 1418, 1427 n.8 (1993).   The parties also agree that if Plaintiff's discrimination claims fail, her claim for wrongful termination in violation of public policy also fails.   Hanson v. Lucky Stores, Inc., 74 Cal.App.4th 215, 229 -30 (1999).   Because Plaintiff has created a triable issue of fact with respect to her discrimination claims and wrongful termination claims, the court

15

1  cannot grant summary judgment on Plaintiff's claim for termination in violation of public policy.

2  **C. Punitive Damages**

3       Defendant contends that it is entitled to summary judgment on Plaintiff's claim for

4  punitive damages because there is no evidence of fraud, malice, or oppression by Defendant.

5  California Code of Civil Procedure § 3294(a) provides:

6       In an action for the breach of an obligation not arising from contract, where it is
        proven by clear and convincing evidence that the defendant has been guilty of
7       oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may
        recover damages for the sake of example and by way of punishing the defendant.

8

9  Malice is defined as "conduct which is intended by the defendant to cause injury to the plaintiff

10 or despicable conduct which is carried on by the defendant with a willful and conscious disregard

11 of the rights or safety of others."  Cal. Civ. Pro. § 3294(c)(1).   Oppression is defined as

12 "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of

13 that person's rights."  Cal. Civ. Pro. § 3294(c)(2).   Fraud is defined as "an intentional

14 misrepresentation, deceit, or concealment of a material fact known to the defendant with the

15 intention on the part of the defendant of thereby depriving a person of property or legal rights or

16 otherwise causing injury."   Cal. Civ. Pro. § 3294(c)(3).   At trial a plaintiff must show

17 oppression, fraud, or malice by "clear and convincing" evidence, and this standard of proof

18 should be taken into account in ruling on a motion for summary judgment. American Airlines,

19 Inc. v. Sheppard, Mullin, Richter & Hampton, 96 Cal.App.4th 1017, 1049 (9th Cir. 2002).

20      For the reasons discussed above, the court finds that at this time there is a disputed issue

21 of material fact over whether Defendant terminated Plaintiff because of her race, national origin,

22 or ancestry.   If a trier of fact agrees with Plaintiff's evidence and finds Defendant's proffered

23 reason for Plaintiff's termination is simply pretext for Defendant terminating Plaintiff based on

24 her race, national origin, and ancestry, a trier of fact would necessarily also conclude that

25 Defendant lied about its real reason for terminating Plaintiff.   In such a case, a trier of fact could

26 conclude that there is clear and convincing evidence that Defendant acted with oppression, fraud,

27

28                                          16

1    and/or malice.   Thus, summary judgment on Plaintiff's punitive damage request cannot be given.

2    **ORDER**

3        Accordingly, based on the reasons set forth in this memorandum opinion and order, the

4    court ORDERS that Defendants' motion for summary judgment is DENIED.

5

6    IT IS SO ORDERED.

7    **Dated:**    **December 6, 2006**                 **/s/ Anthony W. Ishii**

8    0m8i78                                           UNITED STATES DISTRICT JUDGE